| | | |
|---|---|---|
| JULIO ORTIZ-RESTO ET AL. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 17-02362-WGY |
| THOMAS RIVERA-SCHATZ, | ) | |
| GABRIEL HERNANDEZ, | ) | |
| ROBERTO MALDONADO-VELEZ ET AL., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

YOUNG, D.J.[1]                                      June 22, 2021

## MEMORANDUM OF DECISION

## I.    INTRODUCTION

On March 9, 2021, defendants Thomas Rivera-Schatz, Gabriel
Hernandez, and Roberto Maldonado-Velez (collectively, "the
Defendants") noticed an interlocutory appeal of this Court's
February 8, 2021, partial denial of summary judgment, Order
(Feb. 8, 2021) ("Order 1"), ECF No. 133, without identifying the
issue that would permit such an extraordinary appeal, Notice of
Appeal, ECF No. 137.  On May 10, 2021, the Defendants clarified
with the First Circuit Court of Appeals that the basis of their
interlocutory appeal is the Court's denial of qualified immunity
as to three plaintiffs: Elizabeth Colón-Rodríguez ("Colón-

---

[1] Of the District of Massachusetts, sitting by designation.

Rodríguez"), Pierre Vega-Alameda ("Vega-Alameda"), and Horidel Pons-Anaya ("Pons-Anaya").[2] "[W]here, as here, a denial of summary judgment implicates a claim of qualified immunity, the dividing line between appealable and nonappealable denials of summary judgment is blurred." Norton v. Rodrigues, 955 F.3d 176, 184 (1st Cir. 2020) (quoting Morse v. Cloutier, 869 F.3d 16, 22 (1st Cir. 2017) (quotations and citations omitted)). As the First Circuit teaches, "the crucial distinction between appealable and non-appealable summary judgment orders denying qualified immunity is this: purely legal rulings implicating qualified immunity are normally reviewable on an interlocutory appeal, but rulings turning on either an issue of fact or an issue perceived by the trial court to be an issue of fact are not." Id. (brackets, citation, and quotations omitted). As discussed below, there are questions of fact -- or perceived questions of fact -- that preclude judgment as matter of law on the issue of qualified immunity as to these plaintiffs at this stage of the litigation.

---

[2] The Court granted qualified immunity on summary judgment with respect to plaintiff Carlos Kuidland-Diaz. Order (Feb. 8, 2021) ("Order 1"), ECF No. 133.

## II.  BACKGROUND

### A.  The Costly Perpetual War Between the Puerto Rico Political Parties

The disheartening history of political retribution between the major political parties in Puerto Rico is well known to the First Circuit:

> Puerto Rico has two major political parties that dominate the electoral landscape: the Popular Democratic Party (PDP) and the New Progressive Party (NPP). Control of the government periodically switches between the two parties. Entirely too often, the political party assuming office terminates the employment of public employees who are affiliated with the party going out of power and then fills those vacancies with its own members. By the same token, the outgoing party attempts to secure the continued tenure of its members in public jobs through a variety of devices, such as reclassifying policy-type appointments as career positions or making appointments in violation of Puerto Rico law. . . . [A]dministrations in Puerto Rico have continued to take employment actions against public employees because of their political affiliations. With each change in administration -- at both the commonwealth and municipal levels -- the federal district courts in Puerto Rico are flooded with hundreds of political discrimination cases, many of which are appealed.

Sanchez-Lopez v. Fuentes-Pujols, 375 F.3d 121, 125-26 (1st Cir. 2004). What is unique to this landscape is that public officials are keenly aware of and follow the decisions of this district and the First Circuit. As the late Judge Torruella pointed out:

> This circuit leads the nation as one of the most prolific generators of political discrimination cases;

[3]

in this area of litigation, the District of Puerto
Rico has the dubious distinction of being the most
fecund district in the circuit. See Morales-Santiago
v. Hernández-Pérez, 488 F.3d 465, 466 (1st Cir. 2007)
("[I]n Puerto Rico, a change between the Popular
Democratic Party (PDP) and the New Progressive Party
(NPP) [gives rise to] overly zealous political
operatives of the prevailing party terminat[ing],
demot[ing], or reduc[ing] the salaries of employees
affiliated with the outgoing opposition party."). As
a result of the proliferation of these cases and their
public notoriety, the legal precepts established by
them are widely known in Puerto Rico, particularly by
those in public administration.

López-Quiñones v. P.R. Nat'l Guard, 526 F.3d 23, 29 (1st Cir.

2008) (Torruella, J., concurring in part and dissenting in part)

(emphasis added). Student commentators have recently observed

the breathtaking scope of the problem:

> [A]fter the end of the PDP's dominance in the 1968
> elections, every election cycle has brought with it a
> string of politically motivated dismissals both at the
> state and local level. Public servants in Puerto Rico
> are thus subject to the ever-changing winds of
> electoral politics, undermining the principle of
> merit, and destabilizing the public administration of
> the Commonwealth. The economic effect wrought by this
> nefarious tradition is staggering. Both the Court of
> Appeals for the First Circuit and Supreme Court of
> Puerto Rico have felt the need to remark on the costs
> brought on by politically discriminatory dismissals.
> In a 1993 study, the Puerto Rico Civil Rights
> Commission estimated the total cost of political
> discrimination lawsuits over a five year period to be
> over 100 million dollars. Another study identified
> four municipalities that had to take out loans with
> the Government Development Bank for Puerto Rico and
> the Treasury Department to be able to pay outstanding
> claims. Municipalities alone paid more than thirty-
> nine million dollars in settlements and jury awards
> between 2000 and 2008, and this does not take into
> account litigation costs like legal fees, or employer
> contributions to the state retirement system that must

be paid if the employee is reinstated. As the
introductory quotation to this article suggests,
however, the most severely hit may be the dismissed
employees. As of April, 2016, public sector
employment as a share of total employment equaled
25.76%, and, as such, the government is the largest
single employer in the island. In an economy where
less than 40% of the working age population is
employed and which suffers from an 11.9% unemployment
rate, losing a government job can be a devastating
blow for which there is no readily available
replacement.

The scale of this problem is made evident in the
federal court system where, in comparative terms, the
number of political discrimination cases hailing from
the District Court for the District of Puerto Rico far
outnumbers political discrimination cases from other
federal districts. A tangential effect of the
disproportionate representation of Puerto Rico in
these cases has been the influence the First Circuit
has exerted over other circuits in the development of
public employment political discrimination
jurisprudence.

Alexandra Sabater Baerga & Jean R. Santiago Cruz, A Spoiled

Spoils System: Puerto Rico's Epidemic of Political

Discrimination and the Federal Courts, 85 Rev. Jur. U.P.R. 1327,

1328-30 (2016) (footnotes omitted). According to these

commentators, from 1970 to 2015, the District of Puerto Rico

entertained 276 political discrimination cases. Id. at 1347-48.

They conclude:

The numbers speak for themselves. It is evident that
political discrimination is a pervasive problem at all
levels of government in Puerto Rico and drains
government resources both directly through awards and
indirectly through litigation. The standard is not to
blame. These cases are fact intensive and require
sufficient pleadings to establish causation between
knowledge and action.

[5]

Id. at 1352; see Rodríguez-Marín v. Rivera-González, 438 F.3d 72, 75 (1st Cir. 2006) ("Discrimination based on political-party affiliation is rampant in government employment in Puerto Rico. . . . It has cost Puerto Rican taxpayers dearly in verdicts paid from public funds.").

**B.    The First Circuit's Prohibition of Incoming Administrations' Use of Pretextual Systemic Reorganizations to Effectuate Otherwise Impermissible Terminations and the Civil Actions before this Court**

It is well settled in the First Circuit that "an incoming administration may not use a systematic reorganization to effectuate otherwise impermissible terminations." Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 8 (1st Cir. 2015) (quoting Rodríguez-Sanchez v. Mun. of Santa Isabel, 658 F.3d 125, 130-31 (1st Cir. 2011) (quotations omitted)).  Three cases before this Court, including this one, arise out of alleged politically motivated firings after the change in administration from PDP to NPP in the November 2016 Puerto Rico elections.[3]  The plaintiffs' central theory of these cases, supported at least by disputed circumstantial evidence, is that soon after taking power, the Defendants (who in this case are high-ranking Puerto Rico Senate officials), engaged in pretextual and systematic

---

[3] The two other civil actions are styled Giarra Washington-Del Valle v. Rivera-Schatz, Civil Action No. 17-01770-WGY, and Damaris Garciá-Perales v. Rivera-Schatz, Civil Action No. 18-01081-WGY.

[6]

firings -- purportedly triggered by fiscal emergencies -- to effectuate otherwise impermissible terminations. None of the Defendants moved for summary judgment on qualified immunity on this central issue. Nor could they, inasmuch as Ocasio-Hernández confirms that such pretextual deck-clearings, as alleged here, are unlawful. Id. Rather, the Defendants in this action only moved in the alternative for qualified immunity as to four plaintiffs on the grounds that these plaintiffs were not protected from political patronage firings. This Court agreed that qualified immunity was appropriate as to Kuidland but denied qualified immunity as to plaintiffs Colón-Rodríguez, Vega-Alameda, and Pons-Anaya. See Order 1.

## III. ANALYSIS

### A. Summary Judgment and Qualified Immunity

The First Circuit has recently discussed the complexity of deciding qualified immunity at the summary judgment stage:

> We are . . . mindful that deciding qualified immunity at the summary-judgment stage can be tricky. See Morelli v. Webster, 552 F.3d 12, 18-19 (1st Cir. 2009) (discussing the "inherent tension" between qualified immunity and summary judgment). Yes, "qualified immunity is 'an immunity from suit rather than a mere defense to liability,'" meaning "'it is effectively lost if a case is erroneously permitted to go to trial,'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)), so qualified immunity's applicability "should be resolved at the earliest possible stage of litigation," Rocket Learning, Inc. v. Rivera-Sánchez, 715 F.3d 1, 8 (1st Cir. 2013) (citing Maldonado v. Fontanes, 568 F.3d 263, 268 (1st Cir. 2009)). But, as

we've observed, "[t]he doctrinal intersection of qualified immunity principles and summary judgment principles is not well mapped," and "[p]lotting that intersection can present thorny analytic problems -- problems that are magnified because of the desire to resolve claims of qualified immunity at the earliest practicable stage of litigation." Morelli, 552 F.3d at 18 (citing Cox v. Hainey, 391 F.3d 25, 29 (1st Cir. 2004)). Furthermore, in qualified-immunity summary-judgment cases, it's a tug-of-war, really, between who gets the benefit of the doubt: summary judgment "requires absolute deference to the nonmovant's factual assertions," while qualified immunity "demands deference to the reasonable, if mistaken, actions of the movant." Id. at 18-19.

We aim to resolve all of this tension by framing the factual events according to summary judgment's traditional leeway to the nonmoving party's version of events, and then asking whether, given that story, "a reasonable officer should have known that his actions were unlawful." Id. at 19.

Justiniano v. Walker, 986 F.3d 11, 27 (1st Cir. 2021). "Because qualified immunity is an affirmative defense to liability, the burden is on the defendants to prove the existence of circumstances sufficient to bring the defense into play." Alston v. Town of Brookline, 997 F.3d 23, 51 (1st Cir. 2021).

**B.   Qualified Immunity Standard**

"Qualified immunity protects . . . [public officials] . . . from suit when a reasonable decision [made in the course of their duties] . . . ends up being a bad guess -- in other words, it shields from liability 'all but the plainly incompetent or those who knowingly violate the law.'" Justiniano, 986 F.3d at 26 (quoting Belsito Commc'ns, Inc. v. Decker, 845 F.3d 13, 22

[8]

(1st Cir. 2016)). "The Supreme Court has long held, beginning with Elrod v. Burns, 427 U.S. 347 (1976) (plurality opinion), and Branti v. Finkel, 445 U.S. 507 (1980), that there is no right to protection on the grounds of political affiliation where political affiliation is legitimately relevant to the employee's job." Eves v. LePage, 927 F.3d 575, 584 (1st Cir. 2019) (en banc) (citations omitted). In this context the Court must determine: "(1) 'whether the nature of the position was such that defendants were entitled to consider . . . political affiliation as a job qualification,' and (2) 'even if they were not, whether a reasonable official at the time would have understood patronage dismissal or demotion to be barred.'" López-Erquicia v. Weyne-Roig, 846 F.3d 480, 484 (1st Cir. 2017) (brackets omitted) (quoting López-Quiñones, 526 F.3d at 25). The second step is satisfied if the right violated was "clearly established," or more specifically, it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Eves, 927 F.3d at 594 (Thompson, J., concurring) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (citation and quotations omitted)). "This is a fair-warning standard -- officials are liable 'for violating bright lines, not . . . for making bad guesses in gray areas.'" Id. (quoting Decker, 845 F.3d at 23). Of course, while helpful, clear violations of the law do not require a case

on point. Id. at 595. This is known as the policy-maker exception to the general rule prohibiting politically based firings, and it is narrow. As Judges Thompson, Torruella, and Barron's concurrence in Eves explained,

> Let's never forget though, that the policymaker exception is exactly what its name implies: an exception -- and a 'narrow' one at that -- to the clearly-established rule against politically-motivated firings. See Borzilleri v. Mosby, 874 F.3d 187, 191 (4th Cir. 2017). And in dealing with the First Amendment -- which protects some of our most cherished rights, see Williams v. Rhodes, 393 U.S. 23, 30-31 (1968) -- courts must be ever-vigilant in ensuring that this limited exception doesn't swallow the rule. Anything less would deal a serious blow to the fundamental principles of our democracy.

927 F.3d at 597.

"The preferred approach is to decide the merits question first, reaching the reasonableness question only if the merits question is resolved against the defendant." López-Erquicia, 846 F.3d at 484. Reasonableness is an objective rather than subjective assessment, focusing "on what a reasonable official could have believed, not on allegations about what the official actually believed." Id. at 485 (brackets omitted).

With respect to political patronage positions, "protection does not extend to positions which potentially 'involve decision making on issues where there is room for political disagreement on goals or their implementation' and where the jobholder is a policymaker, confidential assistant, spokesman, or similar officeholder." Olmeda v. Ortíz-Quiñónez, 434 F.3d 62, 66 (1st

Cir. 2006) (quoting Ortiz-Piñero v. Rivera-Arroyo, 84 F.3d 7, 12 (1st Cir. 1996) and citing Flynn v. City of Boston, 140 F.3d 42, 44-45 (1st Cir. 1998), cert. denied, 525 U.S. 961 (1998)). When determining this issue, "[a]ctual functions of the job, not titles, control, and an official description of job functions is a presumptively reliable basis for determining those functions." Id. (citations omitted). Other evidence, such as deposition testimony, can apparently be considered. See id. (relying on official job description where "no facts contradict[ed] the description," and "at her deposition, [the employee] seemingly endorsed the description"). It is only "[o]nce an understanding of the functions is ascertained" that the Court can determine as "a question of law whether [the position] invoke[s] constitutional protection." Id.

Most recently, in López-Erquicia v. Weyne-Roig, the First Circuit reversed the district court's denial of summary judgment on qualified immunity in a political reorganization case where the defendant admitted that the position fell within the protection of the First Amendment. 846 F.3d at 486. There, a director within the Puerto Rico Anti-Fraud Special Investigations ("AFSI") Unit of the Office of the Insurance Commissioner was dismissed allegedly because of his political beliefs. Id. at 482-83. The First Circuit reviewed the

plaintiff's "Skills Profile," which listed his duties as follows:

> performs "[m]anagerial work . . . of great complexity
> and responsibility . . . under the general supervision
> of the Deputy Supervision and Compliance
> Commissioner." Though the Deputy Commissioner "gives
> out specific instructions for the performance" of such
> work, the AFSI Director "[e]xercises initiative and
> individual judgment in the performance of . . . her
> duties." The Skills Profile also sets forth the
> various "Duties and Responsibilities" of the position.
> Among other things, the AFSI Director "[p]lans,
> coordinates and supervises the work of the . . .
> [u]nit in order to prepare studies and conduct
> investigations and research about the insurance
> industry." The AFSI Director "[c]oordinates with
> federal, local and state agencies, as well as with
> private information agencies that may assist in the
> investigative work" of the unit. The AFSI Director
> also "[d]evelops rules and procedures and interprets
> statutes and regulations related to . . . her area of
> responsibility." The AFSI Director not only
> "[c]ollaborates with and advises the Deputy
> Commissioner in matters related to the duties of the
> unit," but also "[s]ubstitutes for the Deputy
> Commissioner, when required."

Id. at 485–86. The First Circuit then analyzed the functions on a spectrum of positions that were protected and those that were not:

> So, what are we to make of these functions? To answer
> that question, it is helpful to consider a sampling of
> other jobs that have qualified or not qualified for
> protection from politically motivated removal. As we
> pointed out in Flynn v. City of Boston, 140 F.3d 42
> (1st Cir. 1998), "[t]he Supreme Court cases . . .
> granting or looking toward protection . . . have
> involved a floor supervisor, a guard, a process
> server, an assistant public defender, a rehabilitation
> counselor, a road equipment operator, a garage worker,
> and a dietary manager." Id. at 45 (citing pertinent
> cases). We ourselves have found similarly protected a

"director of general services" who was responsible for inventory, maintenance, and related "mechanical" functions as well as the supervision of approximately thirty employees, López-Quiñones, 526 F.3d at 26-27; an administrative aide to the assistant director of a municipal agency, Cordero v. De Jesus-Mendez, 867 F.2d 1, 14-15 (1st Cir. 1989); the "Cleaning Supervisor" of a municipality, id. at 16-17; and the "Internal Auditor" of a municipality, whose nonsupervisory job was to check all municipal payroll and financial records for errors, which he would then report to a superior, id. at 17-18.

Conversely, we have found unprotected the positions of Assistant Secretary of State for Protocol Affairs at the Puerto Rico State Department, who made recommendations to and counseled Puerto Rico's highest elected officials, Méndez-Aponte v. Bonilla, 645 F.3d 60, 67-68 (1st Cir. 2011); a municipal recreation commissioner with "considerable capacity to influence municipal decisions affecting parks and recreation," Foote v. Town of Bedford, 642 F.3d 80, 86 (1st Cir. 2011); an "administrator" who developed legal strategy on environmental law issues and cases for the Puerto Rico Electric Power Authority, Uphoff Figueroa v. Alejandro, 597 F.3d 423, 429-30 (1st Cir. 2010); a municipal police chief, Wilson v. Moreau, 492 F.3d 50, 53 (1st Cir. 2007); an "Executive II" in Puerto Rico's Department of Labor who participated in "the formulation and implementation of public and finance policy," Valdizán v. Rivera-Hernandez, 445 F.3d 63, 65-66 (1st Cir. 2006); a regional tax administrator, Galloza v. Foy, 389 F.3d 26, 31-32 (1st Cir. 2004); associate directors of several community centers, Flynn, 140 F.3d at 45-46; and an audit director who supervised employees and counseled a senior official about policy matters, Zayas-Rodriguez v. Hernandez, 830 F.2d 1, 3 (1st Cir. 1987).

López-Erquicia, 846 F.3d at 486. The First Circuit held that it did not need to place the position on the spectrum of the precedent, but rather "need determine only whether that precedent 'placed the . . . constitutional question beyond

[13]

debate,'. . . i.e., whether it clearly established the position's constitutionally protected status." Id. (quoting Ashcroft, 563 U.S. at 741). The First Circuit found "especially significant [the plaintiff's] responsibility to 'develop rules and procedures and interpret statutes and regulations' while 'advising' and even 'substituting for the Deputy Commissioner.'" Id. (brackets omitted). These job requirements suggest "that [the plaintiff] is an official, that she is involved in policymaking at least as an adviser, and that she is expected on occasion to serve as a representative of the [Office of the Insurance Commissioner] itself." Id. at 486-87 (quoting Olmeda, 434 F.3d at 67).

### C. Questions of Fact Preclude Summary Judgment on Whether the Positions Qualify for the Political Patronage Exception and Whether the Defendants Were Qualifiedly Immune

The Defendants claim that the three positions qualified within the exception to political firings because they were political patronage positions. Defs.' Mot. Summ. J. 6-9 ("Defs.' Mot."), ECF No. 65. Alternatively, the Defendants argue that they are entitled to qualified immunity because it was insufficiently clear whether the positions fell within the exception given the nature of the positions' duties and the lack of caselaw directly on point. Id.; see Eves, 927 F.3d at 594 (Thompson, J., concurring).

The evidence before this Court comes predominantly in two forms: job descriptions and testimony. As to Colón-Rodríguez, her job duties suggest that she was an event coordinator -- not involved in a policy-making or confidential role. Statement Uncontested Material Facts, Ex. 52, Position: Protocol Officer, ECF No. 66-86; Pls.' Mot. Submitting Translations, Ex. F, Position: Protocol Officer, ECF No. 96-7. Colón-Rodríguez attests to other duties, including organizing school-children's visits to the Senate, greeting invitees at official events, and during the month of December, coordinating a project for preparatory school children to help decorate the Senate. Statement Uncontested Material Facts, Ex. 50, Transcription Oral Dep. Taken Elizabeth Colón Rodríguez 13-17, ECF No. 66-83. She did not supervise anyone and was supervised by a Deputy Director and Director, who gave her instruction. Id. She made $2,000 per month. Id. at 17. Colón-Rodríguez testified that she worked on other unidentified projects, but there was no follow-up questioning as to these projects. Id. As a Protocol Officer, she avers that she was not a "trust employee." Id. at 34-35. When the descriptions are read in conjunction with the testimony, her duties are unclear. Taking all reasonable inferences in favor of the plaintiffs, see Justiniano, 986 F.3d at 27, Colón-Rodríguez is, on these facts and in the light most

favorable to the plaintiffs, more akin to an event planner or reception hostess.

With respect to Pons-Anya and Vega-Alameda, both were Liaison Technicians. The Defendants argue that these positions were ascribed to the Office of Governmental Affairs. Defs.' Mot. at 8-9.

> The duties of Liaison Technician include attending citizens, provide orientation, interpret and channel petitions and requests for assistance from the Senate in matters involving the Legislative Assembly, government agencies and municipalities. Moreover, the position involves frequent contact with elected officials and policymakers, in representation of the Senate and its President, which entails managing communications between the Senate and constituents. As such, the positions once held by Pons-Anya and Vega-Alameda were undoubtedly "confidential" and policymaking in nature, and were not protected from political patronage dismissal.

Id. (citations omitted). Plaintiffs' counter that these are information desk service providers. Pls.' Resp. Opp. Defs.' Mot. Summ. J. 12-13, ECF No. 85 (distinguishing Alburquerque v. Faz Alzamora, 357 F. Supp. 2d 385, 393 (D.P.R. 2004)).

Pons-Anya's and Vega-Alameda's job descriptions are identical, although the translations provided by the parties are subtly different. Their job duties appear primarily to assist constituents with requests related to services provided by the legislature and government agencies, including channeling communications and some data entry. Statement Uncontested Material Facts, Ex. 62, Job Description, ECF No. 66-101; Pls.'

[16]

Mot. Submitting Translations, Ex. AAAA, Job Description, ECF No. 96-80; Statement Uncontested Material Facts, Ex. 68, Job Description, ECF No. 66-109; Pls.' Mot. Submitting Translations, Ex. YYY, Job Description, ECF No. 96-78.

Vega-Alameda testified at his deposition that his position was merely "a link between the citizens and the Senate," that he assisted them in procuring help from the government and that the office was a service office to channel the needs of citizens. Statement Uncontested Material Facts, Ex. 60, Transcription Oral Dep. Taken Mr. Pier André Vega-Alameda 60-62, ECF No. 66-98. Moreover, the functions as described by Vega-Alameda were wholly unconcerned with political matters. Id. at 62. He specifically testified:

> [T]he Government Affairs Office was not an office that worked directly with public policy making-decisions; that was at the floor. We were part of that. We never went there. We were just a link between citizens and the Senate as a government structure, which has been there since years and years and years.

Id. at 60:20-24, 61:1-2. Further, he testified, "We just provide the service. We didn't take agendas in politics because we were in the floor, and we didn't work directly with the President of the Senate. We were just a service office." Id. at 62:14-17. Again, read in context with the job descriptions, there is a question of fact as to Vega-Alameda's duties, and at

least taken in the light most favorable to the plaintiffs, the facts indicate a protected position.

Pons-Anya testified similarly to Vega-Alameda about her duties:

> Okay, the Director have for example seven liaison (sic), right? And they are different governments, office governments; and she divided to each and every liaison, and I was working to the General Electric family. Also, I was working for Acueductos, is the water. And also -- I don't remember the other one. I was, the work for. That was the work: if someone go to the office and have a problem something like that, so they, the person can go in walking and express their difficulties that's having, and I help; or if they even call for a telephone. I don't remember the fourth. I don't remember right now. But it was divided into seven liaisons.

Statement Uncontested Material Facts, Ex. 66, Transcription Oral Dep. Taken Mrs. Horidel Y. Pons Anaya 13:10-22, ECF No. 66-106. Although not cited by the Defendants or plaintiffs, her testimony is somewhat contradictory inasmuch as she describes her belief that everyone in her office worked in political trust of the President of the Senate. Id. at 56:13-16. Nevertheless, these two individuals work for the same office, and there are genuine issues of material fact as to whether these two positions with identical job descriptions in the same office were essentially service conduits to all citizens of the Commonwealth of Puerto Rico or, instead, were policy-making or confidential positions.

[18]

In sum, as to the three plaintiffs, the Defendants mistakenly presume that job duties are conclusive, rather than presumptive, and ignore unresolved questions of fact regarding exactly what duties these plaintiffs performed. The "doctrine in this area remains largely a porridge of general statements and variables: positions are less likely to be protected to the extent that they are 'higher,' more 'political,' more 'confidential,' and so on; duties prevail over titles; everything depends on circumstances." López-Quiñones, 526 F.3d at 25-26. At bottom, the binding First Circuit decisions center on "whether a position's functions are those of a policymaker, a privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation is an equally appropriate requirement." Id. at 26 (citations and quotations omitted). The Court rules that questions of fact prevent a ruling of law on these positions. Nevertheless, to the extent that any inferences can or must be made taking the plaintiffs' version of the facts, Justiniano, 986 F.3d at 27, the Court rules that Defendants have not met their burden to establish that these positions fall within the political patronage exception. See Eves, 927 F.3d at 594 (Thompson, J., concurring) ("[T]he policymaker exception is exactly what its name implies: an exception -- and a 'narrow' one at that -- to the clearly-established rule against politically-motivated

firings."). Although the Defendants rely on Alburquerque, 357
F. Supp. 2d at 385, it is meaningfully distinguishable as it was
decided on undisputed facts. Furthermore, given the First
Circuit's development of the doctrine of patronage dismissals
and qualified immunity, Alburquerque is inapposite.

Where there are questions of fact as to whether the
positions were protected from patronage dismissal, the Court
also rules that genuine issues of material fact preclude a
determination of objective reasonableness for qualified immunity
to attach on this record. To be sure, "[t]he objective
reasonableness inquiry is highly fact specific and often
requires an examination of the information possessed by the
defendant officials." García-Matos v. Bhatia-Gautier, 156 F.
Supp. 3d 245, 257 (D.P.R. 2016) (brackets and ellipsis omitted)
(quoting Diaz-Garcia v. Surillo-Ruiz, 113 F. Supp. 3d 494, 525
(D.P.R. 2015) (citing Swain v. Spinney, 117 F.3d 1, 9-10 (1st
Cir. 1997); Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir.
2009); Kelley v. LaForce, 288 F.3d 1, 7 (1st Cir. 2002))).

Furthermore, and in the alternative, viewing the record in
the light most favorable to the plaintiffs, the named defendants
either were not aware (in the case of Rivera Schatz) or did not
consider job duties at all, but rather seniority. See Pls.'
Statement of Additional Uncontested Facts, Ex. 91, Schatz Answer
Pls.' First Set Interrogs., Answer No. 7, ECF No. 84-91; id.,

Ex. 92, Hernandez-Rodriguez Answer Pls.' First Set Interrogs.,

Answer Nos. 3, 5, 7-8, 12-14, ECF No. 84-92; id., Ex. 93,

Maldonado-Velez Answer Pls.' First Set Interrogs., Answer Nos.

3, 7-8, 12-14, 18-19, ECF No. 84-93. Maldonado-Velez identified

two individuals in human resources, Nicolas Torres and Francisco

J. Pares Adorno as individuals who compiled lists. See

Maldonado-Velez Answer Pls.' First Set Interrogs. Answer No. 8.

Review of their respective deposition testimony confirms that

seniority, not actual job duties, was considered at least from

their perspectives. See generally, Statement Uncontested

Material Facts, Ex. 36, Tr. Dep. Nicholas Torres 14-21, 24-29,

47-49, ECF No. 66-68; id., Ex. 37, Tr. Dep. Francisco J. Pares

Adorno, ECF No. 66-69 ("Pares Adorno Dep."). Indeed, when

examined at his deposition, Pares Adorno answered that he was

not asked or does not recall whether he was asked to analyze an

employee's duties prior to the layoff in 2017:

> Q:   Sir, were you ever asked to perform an
>      analysis of the employees and their duties at the
>      Senate in order to determine who could be laid off and
>      who could not be laid off?
>
> A:   No. I don't recall.

Pares Adorno Dep. 50:10-14 (emphasis added).

As to whether the Defendants are qualifiedly immune, on

what little of the summary judgment record is undisputed, it

would be unreasonable for a public official to believe that

[21]

these positions qualified for the narrow exception to political patronage firings. "Of course, the abstract right of a non-policy-related employee to be free from politically motivated termination dates from Elrod and Branti; but this is not enough to defeat qualified immunity." López-Quiñones, 526 F.3d at 27. "The crucial question here is whether a reasonable official acting at the time of [the plaintiff's] termination should have known on what side of the Elrod/Branti line [the plaintiff's] . . . position fell." Id. But what is a "reasonable" public official in this context? As the late Judge Torruella urges, a reasonable public official in light of the First Circuit's developed case law must at least inquire as to the nature of the duties of the position based upon the history of political discrimination cases in Puerto Rico:

> As a result of the proliferation of [political discrimination cases] cases and their public notoriety, the legal precepts established by them are widely known in Puerto Rico, particularly by those in public administration. It is, therefore, inconceivable in this day and age that a reasonable public official would by-pass an inquest into whether a position in a government agency requires political affiliation before taking the drastic action of firing an employee based on party affiliation. Considering the state of the law, one who fails to do so can hardly be classified as a reasonable public official.

Id. at 29 (Torruella, J., concurring in part and dissenting in part) (emphasis added).

This Court agrees, and questions whether qualified immunity should inure to the benefit of defendants in political discrimination cases where there is no evidence that the officials' actions included examining <u>any</u> of the plaintiffs' duties <u>at all</u>. That is, should an official who simply ignores the well-developed law of this Circuit and engages in an across-the-board firing of plaintiffs receive the benefit of qualified immunity by serendipity? After all, it is the <u>reasonable but</u> mistaken call, not the <u>reckless and</u> mistaken call, which qualified immunity is designed to protect. Judge Torruella's thoughtful partial concurrence and dissent in <u>López-Quiñones</u> explains the distinction here and the need to dig deeper:

> It is in the granting of immunity that I part company with my learned colleagues. Under our qualified immunity law, after finding that a constitutional right was violated, we turn to whether the law was clearly established at the time of the violation and whether a reasonable public officer would have understood that he was violating that right. <u>See</u> <u>Sueiro Vázquez</u> v. <u>Torregrosa de la Rosa</u>, 494 F.3d 227, 234 (1st Cir. 2007). I disagree with the majority's conclusion that "as the law stood . . . a reasonable official could (albeit mistakenly) have deemed López[-Quiñones] outside <u>Elrod</u>/<u>Branti's</u> protection." Op. at 27-28. As made evident by the majority's own application of our clearly established law, López-Quiñones's position was not subject to patronage dismissal. <u>In deciding to terminate López-Quiñones</u> <u>from his position, the officials in this case</u> <u>recklessly ignored the established law of this</u> <u>circuit.</u> <u>Such behavior should lead to the</u> <u>dispossession of the mantle of qualified immunity,</u> <u>rather than the extension of this privilege to them.</u>

The majority is able to conclude that the appellants are entitled to immunity because it gives undue weight to the fact that López-Quiñones's "job title [is] similar" to two prior cases "concerning regional directors of government agencies in Puerto Rico." Id. at 28 (citing Duriex-Gauthier v. López-Nieves, 274 F.3d 4 (1st Cir. 2001) and Román Meléndez v. Inclán, 826 F.2d 130 (1st Cir. 1987)). In so doing, the majority violates those very principles to which it claims adherence only a few pages earlier. As we have warned, the inquiry into the legitimacy of political patronage requires an inquiry that goes beneath the mere title of the position. See, e.g., Olmeda v. Ortiz-Quiñonez, 434 F.3d 62, 66 (1st Cir. 2006) ("Actual functions of the job, not titles, control, and an official description of job functions is a presumptively reliable basis for determining those functions." (internal citations omitted)); Flynn, 140 F.3d at 44 (noting that "duties prevail over titles"). Unfortunately, it appears that the majority's invocation of this principle was mere lip service; in its grant of immunity, the majority inexplicably applies an entirely different and contradictory standard.

Even if the job titles in Duriex-Gauthier and Román Meléndez are similar to that of López-Quiñones, the employees' actual responsibilities are substantially different. The employees in Duriex-Gauthier and Román Meléndez held "trust positions;" exercised meaningful supervision of a large number of employees; enjoyed discretion over the particular government services under their aegis; and represented their respective agencies before the public and other government entities. Duriex-Gauthier, 274 F.3d at 7-8, 10; Román Meléndez, 826 F.2d at 134-35. In contrast, none of those prerogatives or powers are present here.

Most importantly, unlike the employees in Duriex-Gauthier and Román Meléndez, López-Quiñones was not involved in making or recommending any agency policy. There is nothing in the record to support a finding that López-Quiñones was a policymaker. The majority opinion describes him as having only "modest, if any, involvement in policymaking," Op. at 26, and even the appellants "failed to identify policy decisions in which López [-Quiñones] was directly involved or over

which he had influence." Id. at 27. Policymaking is
the key function in requiring that the employee be
required to belong to the political party in power.
See Elrod, 427 U.S. at 367 (holding that under the
First Amendment "patronage dismissals" must be
restricted to "policymaking positions").

As stated by the majority at the outset of its
opinion: "Our decisions . . . ask[] whether a
position's functions are those of 'a policymaker, a
privy to confidential information, a communicator, or
some other office holder whose function is such that
party affiliation is an equally appropriate
requirement.'" Op. at 26 (quoting Jiménez Fuentes v.
Torres Gaztambide, 807 F.2d 236, 242 (1st Cir. 1986)
(en banc)). López-Quiñones's job functions do not
fall into any of those categories. He was essentially
a foreman over a group of janitors and similar
employees; membership in a particular political party
was not a requirement of his job. It is truly
difficult to believe that this was not known or easily
discoverable by the appellants after applying our
established jurisprudence in this area. After
professing to apply our clear and established
precedent regarding patronage dismissals, the majority
makes an about-face and inexplicably relies on López-
Quiñones's job title rather than on his
responsibilities or functions. See id. at 28. Far
from clarifying the law, the majority muddles it and,
in the process, gives a free ride to government
officials who are not entitled to or deserving of such
exceptional treatment.

526 F.3d at 30-31 (Torruella, J., concurring in part and

dissenting in part) (emphasis added). More recently, Judge

Dominguez in denying summary judgment recently reflected on

Judge Torruella's dissent in Caraballo-Rivera v. Garcia-Padilla:

The Court now takes a moment to acknowledge the Hon.
Juan Torruella's concurrence and partial dissent in
Lopez-Quinones v. Puerto Rico Nat. Guard, 526 F.3d 23,
29-30 (1st Cir. 2008) (Torruella, J., concurring in
part, dissenting in part). Former Circuit Chief Judge
Torruella addressed the issue of qualified immunity in

[25]

a context similar to the facts of the instant case. <u>Specifically, the notion that high-level policymakers rely on job classifications, as opposed to actual duties, when making firing decisions.</u> Judge Torruella remarked that the defendant in <u>Lopez-Quinones</u> "recklessly ignored established law of this circuit" in firing the plaintiff and "such behavior should lead to the dispossession of the mantle of qualified immunity, rather than the extension of this privilege to them." <u>Id.</u> The Court echoes Judge Torruella's sentiment today.

<u>It is an all-too-familiar occurrence for Puerto Rico's officials to act off political motives and then run for cover under the umbrella of qualified immunity. The Court does not find this type of behavior reasonable, particularly as more years go by and the Section 1983 rain down upon the courts every four years. Numerous cases have held that job duties, not mere titles, should govern personnel decisions in Puerto Rico's government. Notwithstanding, officials continue to ignore the law and lean on manufactured titles and classifications to justify their decisions. This behavior is unreasonable and destructive to the inner-workings of Puerto Rico's government.</u>

Civ. No. 14-1435 (DRD), 2017 WL 4417614, at *13-14 (D.P.R. Oct. 3, 2017) (emphasis added).

Here, it is unclear what the Defendants relied upon at all, but on this record, there is no evidence that the Defendants relied upon an examination of the positions' duties. Rather, the Defendants in their motion posit that only two criteria were reviewed:

Two non-discriminatory criteria were used to select the employees of the administrative areas who would be dismissed on January 31, 2017: <u>the need for the particular service provided by the employee in each area, and the employee's seniority based on the time working in the public sector. The first factor involved input given to Hernández-Rodríguez from the</u>

> Administrator, the Senate Clerk and the Sergeant-at-
> Arms regarding the amount of employees necessary to
> continue providing services. The second factor was an
> analysis made by third-party personnel from the Human
> Resources Office regarding the employee's seniority,
> measured in the amount of time the employee had served
> in the public sector. The source of information used
> to determine the seniority was the information in each
> employee's personnel file. On January 31, 2017,
> several Senate employees, including plaintiffs,
> received dismissal letters signed by Maldonado-Vélez.

Defs.' Mot. 13 (emphasis added). There are, therefore, additional disputed questions of fact that preclude resolution of this issue in favor of the Defendants on reasonableness on this record where there is an absence of evidence on whether the plaintiffs' duties were considered. Indeed, and in any event, defendant public officials cannot willfully blind themselves to the plaintiffs' duties when making politically motivated termination decisions and claim to be acting reasonably. Just the opposite -- reasonable officials would seek out sufficient information to make informed decisions, especially in light of the First Circuit's well-settled caselaw that reviews and relies upon those actual duties. Whether the terminations at issue in this case were politically motivated or merely a garden variety reorganization is a hotly contested question for trial in this action. What the Defendants considered in making their decision might not be, but the Defendants -- at least on the record here

-- have not met their burden at summary judgment that, objectively, they acted reasonably.[4]

## IV. CONCLUSION

The Court echoes the First Circuit's recognition of the "tug-of-war" between the summary judgment standard (which weighs in favor of resolution of disputes by trial) and the doctrine of qualified immunity (which weighs in favor of determining immunity from suit for damages at the earliest possible stage of proceedings). Justiniano, 986 F.3d at 27. As the First Circuit mandates, this Court is required to "fram[e] the factual events according to summary judgment's traditional leeway to the nonmoving party's version of events, and then ask[] whether, given that story, a reasonable officer should have known that his actions were unlawful." Id. (citation and quotations omitted). Applying this nuanced standard to the record before this Court, the Defendants have not met their burden: questions of fact preclude summary judgment, and therefore the motion was

---

[4] As is often the case, the discipline of writing refines analysis. Here, an exhaustive review of the summary judgment record reveals no evidence that the Defendants ever were even aware of the job duties of these three plaintiffs. Even taking the evidence in the light most favorable to the Defendants, this appears fatal to the Defendants' claims of qualified immunity. What I could have done, therefore, was after notice grant summary judgment against the Defendants. Fed. R. Civ. P. 56(f)(1). Of course, in view of the interlocutory appeal, I may not now do so.

<u>DENIED</u> on the issue of qualified immunity as to plaintiffs
Colón-Rodríguez, Vega-Alameda, and Pons-Anaya.

WILLIAM G. YOUNG
DISTRICT JUDGE